UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

PAMELA NABOYCHIK,

    Plaintiff,

v.	Case No. 18-13429

UNITED STATES OF AMERICA,

    Defendant.

_____/

**OPINION AND ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Pamela Naboychik brings this personal injury action against Defendant United States of America based upon claims of negligence, gross negligence, owner's liability under Mich. Comp. Laws § 257.401, and negligent entrustment. (ECF No. 1.) Plaintiff's vehicle was struck from behind by a postal van driven by a worker for the United States Postal Service ("USPS"). Plaintiff claims to have suffered injuries requiring substantial medical care.

Defendant moves for partial summary judgment, asking the court find that Plaintiff cannot recover damages for wage loss, herniated discs, or a spinal fluid leak. (ECF No. 20.) Plaintiff has filed a response and Defendant has replied. (ECF No. 23, 25.) The court finds a hearing unnecessary, E.D. Mich. L.R. 7.1(f)(2), and for the reasons provided below, the court will grant in part and deny in part Defendant's motion.

## I. BACKGROUND

For a case involving a rear-end collision, the facts in this case are extensive and complex. They are provided below, taken from the record established by both parties. Each material fact is either agreed upon or lacks contradictory evidence.

Plaintiff was operating her vehicle in West Bloomfield, Michigan on June 9, 2017. (ECF No. 20-5, PageID.220; ECF No. 23, PageID.688.) She was stopped at a traffic light. In front of her was another vehicle, and behind her was a white box-style mail truck, also stopped, driven by a USPS worker. (ECF No. 20-5, PageID.220; ECF No. 23, PageID.688.) The postal driver testified that while reaching for a mail tray that had become dislodged in the mail truck, he took his foot off the brake. The truck drifted forward, and hit Plaintiff's vehicle. (ECF No. 20-5, PageID.220.) He estimated the truck was traveling at around five miles per hour at the moment of impact. (*Id.*, PageID.223.)

Plaintiff testified that when her car was hit, she gripped the steering wheel, and pressed hard on her brakes to stop her car. (ECF No. 20-4, PageID.188.) Plaintiff's car did not contact the car in front of her. (ECF No. 20-4, PageID.190.) Her airbag did not deploy, and photos show that the car suffered only minor dents and damage, with the plastic bumper shroud becoming dislodged. (ECF No. 20-8, PageID.253; ECF No. 23, PageID.688.) The mail truck suffered a cracked exterior rear-view mirror. (ECF No. 20-5, PageID.223.)

Eighteen days after the accident, on June 27, 2017, Plaintiff sought treatment from her primary care physician. (ECF No. 20-4, PageID.193; ECF No. 20-9, PageID.261.) Plaintiff reported being "stiff following [the] accident" and experiencing "worsening . . . back pain." (ECF No. 20-9, PageID.261.) A magnetic resonance imaging

("MRI") exam was conducted the next day and found "[n]o evidence of disc herniation," but "[m]ild disc bulge[s]" and "moderate degenerative changes." (ECF No. 20-10, PageID.274.)

Plaintiff returned to her primary care doctor on July 10, 2017, complaining of continued back and leg pain. (ECF No. 20-9, PageID.260.) A nurse practitioner diagnosed Plaintiff with anterolisthesis and neural foraminal stenosis. (*Id.*)

Plaintiff was referred to a neurologist, Dr. Prashant Kelkar. (*Id.*) Plaintiff met Dr. Kelkar on July 11, 2017, and reported moderate back pain and severe leg pain. (ECF No. 20-11, PageID.305-06.) Dr. Kelkar reviewed Plaintiff's MRI and found that "[i]t demonstrated a traumatic disc herniation." (*Id.*, PageID.306.)

Dr. Kelkar continued to treat Plaintiff. He saw Plaintiff on August 21, 2017 and ordered another MRI for August 31. (*Id.*, PageID.303.) The radiologist who performed the MRI on August 31 did not find disc herniation but noted "[a] [m]inimal burden of multilevel degenerative changes." (ECF No. 20-24, PageID.661.) Dr. Kelkar reviewed the MRI on September 18, 2017 and found to the contrary of the radiologist, that "[i]t demonstrated disc herniation . . . with broad based disc bulge." (*Id.*, PageID.301.)

Dr. Kelkar saw Plaintiff a total of five times between her first visit in July 2017 and March 2018. (*Id.*, PageID.296-307.) Between July 2017 and March 2018, Plaintiff received physical therapy. (ECF No. 20-12, PageID.336-57.) From August to November 2017, Plaintiff also received treatment for back and neck pain from Dr. Jason Peter at a pain treatment facility. (ECF No. 20-13, PageID.371-94.)

Then, in April 2018, while performing yoga stretches, Plaintiff experienced a severe headache and a liquid substance leak from her nose. (ECF No. 20-4,

3

PageID.208; ECF No. 20-11, PageID.293.) After searching Google for what could explain her experience, Plaintiff concluded that "it might be a spinal fluid leak." (ECF No. 20-4, PageID.209.) "That [is] why [Plaintiff] called [her] neuro [doctor]," Dr. Kelkar, next. (*Id.*) Several days later, on April 23, 2018, Plaintiff was seen by Dr. Kelkar. (ECF No. 20-4, PageID.208; ECF No. 20-11, PageID.293.)

Dr. Kelkar noted that Plaintiff "had no evidence of leakage from her nose in [his] office." (ECF No. 20-11, PageID.293-94.) The doctor stated that if Plaintiff continued experiencing nasal discharge, he would order a computed technology ("CT") scan of her head, using "thin cuts through the anterior skull base . . . with coronal and sagittal reconstruction," in order to rule out a spinal fluid leak. (*Id.*) A antihistamine drug, Allegra, was recommended to explore the possibility of Plaintiff experiencing only nasal allergies. (*Id.*)

Plaintiff underwent a brain MRI on May 2, 2018, to test for a spinal fluid leak. (ECF No. 20-16, PageID.484.) The radiologist performing the MRI did not find significant abnormalities but recommended a CT scan to rule out "a small focus" being spinal fluid, as opposed to mucous. (*Id.*)

Plaintiff went to an emergency room ("ER") five days later on May 7, 2018, after reporting leaking from her nose over the course of the three prior days. (ECF No. 20-17, PageID.514.) Reports from the ER indicate that "[Plaintiff] state[d] that she was involved in a motor vehicle accident . . . approximately 1 month ago."[1] (*Id.*, PageID.509.) Plaintiff also reported that she experienced substantial fluid come from her nose when "she was

---

[1] It is uncertain whether Plaintiff was referring to the instant USPS accident in June 2017 or a different, more recent accident.

4

doing a yoga pose" and had intermittent discharge after that. (*Id.*, PageID.500.) She had apparently seen an ear, nose, and throat doctor ("ENT"), who was "unable to find the source of the leak." (*Id.*) An internist summarized Plaintiff's complaint, noting that "she was doing yoga . . . [and] noticed some clear liquid dripping out of her nose and she started experiencing pretty severe headaches." (*Id.*, PageID.520.) After being at the ER several hours and after being seen by several professionals, another doctor noted in Plaintiff's patient history that "[s]he was in a car accident recently and since then has random moments of [spinal fluid] leakage." (*Id.*, PageID.514.)

While at the ER, Plaintiff was given a cisternogram, in which a substance was injected into the space around Plaintiff's brain in order to detect on a CT scan any spinal fluid leak.[2] (ECF No. 20-17, PageID.500.) The exam discovered "no evidence of [spinal fluid] leak." (*Id.*) No fluid was produced while Plaintiff was at the ER, but she was given containers in order to collect for testing any suspect fluid she might produce in the future. (*Id.*)

After receiving this test result, Plaintiff underwent a lumbar drain placement, an in-patient surgery designed to treat a spinal fluid leak. She was admitted to a hospital on August 3, 2018. (ECF No. 20-18, PageID.542.) The intake notes stated that Dr. Kelkar had "worked [Plaintiff] up with multiple examinations" and that Plaintiff had received "an MRI of the brain [and a] CT myelogram." (*Id.*, PageID.543.) "[N]o clear identifiable

---

[2] A cisternogram is a test specifically designed to detect spinal fluid leakage. Cleveland Clinic, *Cisternogram Scan* (last visited May 8, 2020), https://my.clevelandclinic.org/health/diagnostics/16873-cisternogram-scan; Cedars Sinai, *Cisternogram* (last visited May 8, 2020), https://www.cedars-sinai.edu/Patients/Programs-and-Services/Imaging-Center/For-Patients/Exams-by-Procedure/Nuclear-Medicine/Cisternogram.aspx.

5

defect . . . [was] noted." (*Id.*) The intake records also stated that her treatment with Dr. Kelkar began "after she had a motor vehicle accident" and she started experiencing nasal drip "during her treatment course." (*Id.*) Other portions of the notes mention that her status was "post motor vehicle collision" and symptoms began "since a [motor vehicle accident]." (*Id.*, PageID.542-43.) After a five-day hospitalization, Plaintiff was released. (*Id.*, PageID.543.) By October 2018, Plaintiff reported again to Dr. Kelkar that she was experiencing nasal dripping. (ECF 20-11, PageID.279.)

Through 2019, Plaintiff underwent several more tests for spinal fluid leak. Medical records repeatedly state that Plaintiff had been in a car accident, that she reported experiencing nasal dripping sometime after the accident, that the dripping was suspected (by Plaintiff) of being spinal fluid, and that all tests designed to determine the existence of a spinal fluid leak came back negative.

On March 20, 2019, Plaintiff received a check up from an ENT. (ECF No. 20-20, PageID.560.) An examination of Plaintiff's nasal cavities came back "normal," but the ENT noted excretion from her nose that could "possibl[y]" be a spinal fluid leak. (*Id.*, PageID.561.)

Plaintiff was seen by a surgeon on June 18, 2019. (ECF No. 20-21, PageID.569.) Plaintiff's patient history stated that she had been involved in a motor vehicle accident in June 2017; that ten months after the accident Plaintiff began experiencing nasal excretions; that she was placed on a lumbar drain placement and had nasal dripping within three weeks; and repeated scans had shown "no obvious leak site" for spinal fluid. (*Id.*, PageID.569-70.) Plaintiff had not been able to collect the fluid for testing. (*Id.*)

6

Following her visit with the surgeon, another CT scan was performed. (ECF No. 20-21, PageID.583.) On June 19, 2019, the radiologist found "no evidence to correlate" suspicion of a spinal fluid leak.[3] (*Id.*)

On June 26, 2019, Plaintiff underwent yet another surgery, called nasal endoscopic surgery. (ECF No. 20-22, PageID.596.) Plaintiff's spinal fluid was injected with fluorescein. (*Id.*) A spinal fluid leak was expected to be recognized, if it existed. (*Id.*) "[N]o clear leak was identified." (*Id.*, PageID.589, 596.)

On December 19, 2019, Plaintiff underwent an independent medical examination ("IME"). (ECF No. 20-23, PageID.643.) Upon review of Plaintiff's medical imaging and records, the examining physician concluded Plaintiff suffered from "[l]umbar sprain/strain . . . superimposed on a history of chronic back pain." (*Id.*, PageID.655.) The physician did not find evidence of disc herniation. (*Id.*, PageID.654-55.) He also concluded that it was "[not] possible to say within a reasonable degree of medical certainty . . . that the motor vehicle accident in question caused [Plaintiff] to suffer a spinal fluid leak." (*Id.*, PageID.658.) The physician reasoned "[a] possible [spinal fluid] leak was not reported until well after the motor vehicle accident," which "is not consistent with a traumatic [spinal fluid] leak and head injury"; Plaintiff "did not seek emergency medical care after the . . . accident." (*Id.*, PageID.657-58.)

## II.  STANDARD

To prevail on a motion for summary judgment, a movant must show—point out—that "there is no genuine dispute as to any material fact and the movant is entitled to

---

[3]  The surgeon noted the suspicion on June 18, 2019 and the radiologist ruled it out on June 19. (ECF No. 20-21, PageID.570, 583.)

judgment as a matter of law." Fed. R. Civ. P. 56(a). First, the moving party bears the initial burden of presentation that "demonstrate[s] the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). There is no requirement, however, that the moving party "support its motion with [evidence] negating the opponent's claim." *Id.* (emphasis removed); *see also Emp'rs Ins. of Wausau v. Petrol. Specialties, Inc.*, 69 F.3d 98, 102 (6th Cir. 1995).

Second, "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (emphasis removed) (quoting Fed. R. Civ. P. 56(e)). This requires more than a "mere existence of a scintilla of evidence" or "'[t]he mere possibility of a factual dispute." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 582 (6th Cir. 1992) (quoting *Gregg v. Allen-Bradley Co.*, 801 F.2d 859, 863 (6th Cir. 1986)). For a court to deny summary judgment, "the evidence [must be] such that a reasonable [finder of fact] could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. All reasonable inferences from the underlying facts must be drawn "in the light most favorable to the party opposing the motion." *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Moran v. Al Basit LLC*, 788 F.3d 201, 204 (6th Cir. 2015).

### III. DISCUSSION

Defendant moves for summary judgment on three discrete issues: damages for wage loss, damages for Plaintiff's alleged herniated discs, and damages for Plaintiff's alleged spinal fluid leak. The court will address each issue in turn.

## A.  Wage Loss

Tort liability resulting from a motor vehicle accident is governed by Michigan's "no-fault" insurance act, Mich. Comp. Laws § 500.3101, *et seq*. Under the act, "all automotive insurance policies offered in [the] state must include personal protection insurance, and property protection insurance as provided in this chapter, and residual liability insurance." Mich. Comp. Laws § 500.3101(2). Personal protection insurance comprises of "[w]ork loss[,] consisting of loss of income from work an injured person would have performed during the first 3 years after the date of the accident if he or she had not been injured." Mich. Comp. Laws § 500.3107(1)(b). "[D]amages for work loss consist of wages that a person 'would' have earned but for the accident . . . [as opposed to] wages a person 'could' have earned but for the accident." *Hannay v. Dept. of Transp.*, 497 Mich. 45, 80-81 (2014).

"[T]he no-fault act generally abolishes tort liability arising from the ownership, maintenance, or use of a motor vehicle." *Johnson v. Recca*, 492 Mich. 169, 175 (2012). "[T]ort liability . . . is abolished except as to . . . [damages for] work loss . . . [in excess of] the daily, monthly, and 3-year limitations" established for personal protection insurance. Mich. Comp. Laws § 500.3135(3)(c). Thus, an individual injured in a car accident can bring a claim for lost wages against another driver, called a "third-party action," only if the harmed individual has obtained the full amount of her insurance coverage and still has not been fully compensated. *Hannay*, 497 Mich. at 76. The damages sought must be "work loss" and must be sought after three years of insurance payments. Mich. Comp. Laws § 500.3107(1)(b); Mich. Comp. Laws § 500.3135(3)(c); *Hannay*, 497 Mich. at 80-81.

Defendant points out that the accident took place on June 9, 2017 and three years have not passed. (ECF No. 20-2, PageID.166.) Plaintiff must seek payments for any "work loss" damages from her insurer until that time. Mich. Comp. Laws § 500.3107(1)(b); Mich. Comp. Laws § 500.3135(3)(c). Defendant also claims Plaintiff was unemployed at the time of the accident. Thus, even if Plaintiff were able to seek wage loss damages, Defendant argues, Plaintiff would be owed nothing.

Although having declined to agree with this point when asked for concurrence under Eastern District of Michigan Local Rule 7.1(a), Plaintiff now "concedes that she is not claiming excess wage loss" and does not contest her inability to recover them. (ECF No. 23, PageID.681.) There is no dispute of material fact. As a matter of law, Plaintiff is not entitled to wage loss damages. Fed. R. Civ. P. 56(a). The court will grant summary judgment in favor of Defendant on that discrete issue. *Id.*

### B.  Herniated Discs

Defendant argues there is insufficient evidence to support the existence of Plaintiff's alleged condition of herniated discs.

Defendant points to substantial evidence repeatedly showing that Plaintiff never suffered herniated discs as a result of the accident. The MRI conducted shortly after the accident on June 28, 2017 found "[n]o evidence of disc herniation," but "[m]ild disc bulge[s]" and "moderate degenerative changes." (ECF No. 20-10, PageID.274.) An MRI conducted on August 31, 2017 similarly did not find evidence of disc herniation. (ECF No. 20-24, PageID.661.) Plaintiff received additional MRIs on March 29, 2018 and November 18, 2018, both of which did not report herniated discs. (ECF Nos. 20-25, 20-

26.) The IME conducted on Plaintiff in December 2019 found no evidence of disc herniation. (ECF No. 20-23, PageID.654-55.)

However, Defendant admits in its motion that Dr. Kelkar, the neurosurgeon, opining without any radiological qualifications and to the contrary of all other radiological opinions, claimed that he saw in Plaintiff's scans evidence of one or more herniated discs. (ECF No. 20, PageID.158-59.) It is clear that four different radiologists reviewed imaging of Plaintiff's spine and found no evidence of disc herniation, as did the physician conducting the IME. (ECF No. 20-10, PageID.274; ECF No. 20-24, PageID.661; ECF Nos. 20-25, 20-26; ECF No. 20-23, PageID.654-55.)

Yet Dr. Kelkar reviewed the same MRIs and expressed the conclusion that Plaintiff did, in fact, have herniated discs. (ECF No. 20-11, PageID.276, 284, 296, 301, 306.) Absent evidence to the contrary, it may be fairly presumed that Dr. Kelkar used professional judgment in concluding that the MRIs "demonstrated multilevel disc herniations." (*E.g.*, *id.*, PageID.276.)  Defendant's essential protestation about Dr. Kelkar is that his conclusion was not based upon a solid foundation. (ECF No. 20, PageID.158-59 (referring to "the lack of evidentiary basis for Dr. Kelkar's notations – or his subjective opinion regarding the existence of herniated discs").) It is true that Dr. Kelkar has presented a decidedly minority report, and it would be fair to say that his conclusions lack substantial evidentiary support.

However, the court will not conclude as a matter of law that no reasonable finder of fact could conclude that Plaintiff suffered herniated discs. Fed. R. Civ. P. 56(a); *Anderson*, 477 U.S. at 248. Defendant's request for summary judgment on the discrete issue of Plaintiff's alleged herniated discs will be denied. Fed. R. Civ. P. 56(a).

### C. Spinal Fluid Leak

Defendant argues that there is insufficient evidence to support the existence of Plaintiff's alleged spinal fluid leakage, or to prove that any possible leakage was caused by Plaintiff's accident with a USPS worker.

There exists evidence which, if believed, shows that Defendant first experienced dripping from her nose in April 2018 while she was performing yoga. This was a full ten months after the instant motor vehicle accident with a USPS employee. (ECF No. 20-4, PageID.208; ECF No. 20-11, PageID.293.) She researched her symptoms on Google and then contacted her neurosurgeon on the belief it could be a spinal fluid leak. (ECF No. 20-4, PageID.209.) On May 2, 2018, Plaintiff underwent a brain MRI. (ECF No. 20-16, PageID.484.) The radiologist did not find a spinal fluid leak but suggested a CT scan to clarify "a small focus" that could be spinal fluid. (*Id.*) That CT scan, a cisternogram, was specifically designed to detect spinal fluid leakage. The scan was performed on May 7, 2018 and found "no evidence of [spinal fluid] leak." (ECF No. 20-17, PageID.500.) When Plaintiff went into the ER to receive a cisternogram she reportedly stated that she saw an ENT who was "unable to find the source of the leak." (*Id.*) Dr. Kelkar, before performing lumbar drain placement surgery on August 3, 2018, noted that Plaintiff's prior medical imaging showed "no clear identifiable defect." (ECF No. 20-18, PageID.543.)

In March 2019, Plaintiff was seen by an ENT, who noted that Plaintiff's nasal cavities were "normal" but liquid could "possibl[y]" be spinal fluid. (ECF No. 20-20, PageID.561.) On June 18, 2019, Plaintiff was seen by a surgeon who reviewed Plaintiff's medical history and noted repeated scans had shown "no obvious leak site"

for spinal fluid. (ECF No. 20-21, PageID.569-70.) Another CT scan was performed on June 19, 2019 and "no evidence to correlate" suspicion of a spinal fluid leak was found. (ECF No. 20-21, PageID.583.) Plaintiff underwent another invasive procedure on June 26, 2019, designed to determine whether she was experiencing spinal fluid leak. (ECF No. 20-22, PageID.589, 596.) Yet again, "no clear leak was identified." (*Id.*)

Finally, in December 2019, Plaintiff underwent an IME. The examining physician concluded that it is "[not] possible to say within a reasonable degree of medical certainty . . . that the motor vehicle accident in question caused [Plaintiff] to suffer a spinal fluid leak." (ECF No. 20-23, PageID.658.) The physician found no evidence of spinal fluid leak in Plaintiff medical imaging and reasoned that a spinal fluid leak caused by a traumatic injury, like that of a car accident, would not lay dormant for ten months without requiring medical attention in the interim. (*Id.*, PageID.657-58.)

There is no evidence in the record that any medical professional has examined Plaintiff's imaging or conducted surgical procedures or examinations and affirmatively concluded Plaintiff has a spinal fluid leak. Plaintiff has been screened, examined. and surgically treated for the condition at least five times; every time doctors' reports have come back with a negative result. (ECF No. 20-16, PageID.484; ECF No. 20-17, PageID.500; ECF No. 20-20, PageID.561; ECF No. 20-21, PageID.583; ECF No. 20-22, PageID.589, 596.) Twice, once with an MRI and once with an ENT's physical examination, a doctor has stated that Plaintiff could *possibly* have a spinal fluid leak. (ECF No. 20-16, PageID.484; ECF No. 20-20, PageID.561.) Both times, more powerful and exhaustive CT scans were performed soon thereafter and no evidence to support the suspicions was found. (ECF No. 20-17, PageID.500; ECF No. 20-21, PageID.583.)

The only evidence to which Plaintiff points in support of the "possible" existence of a spinal fluid leak are doctors' notes, particularly those of Dr. Kelkar, that list spinal fluid leak as among Plaintiff's complaints. None of these records indicate that they were actual diagnoses or the result of review of any of the numerous procedures conducted to specifically test for spinal fluid leak. They merely list spinal fluid leak after reciting Plaintiff's own description of liquid emitting from her nose. None of the reported liquid was ever collected or submitted for testing. In fact, the lack of concrete medical evidence to support the diagnosis, and the reliance on mere word-of-mouth personal history from Plaintiff, is recognized in the very documents that mention spinal fluid leak. Dr. Kelkar first listed "[c]erebrospinal fluid leak" under his "[a]ssessments" in April 2018, shortly after Plaintiff's nasal dripping began while performing yoga. (ECF No. 20-11, PageID.293.) In Dr. Kelkar's notes below, he states "[Plaintiff] has *no evidence* of leakage from her nose in my office." (*Id.*, PageID.294 (emphasis added).) He then recommends Allegra, as if to test for the presence of allergies.[4] (*Id.*) When Plaintiff was admitted into a hospital to receive a lumbar drain placement, Dr. Kelkar explicitly stated: "DIAGNOSIS: [spinal fluid] rhinorrhea" (discharge from the nose). (ECF No. 20-18, PageID.543.) Yet on the same page, mere lines under the purported "diagnosis," Dr.

---

[4]   Other visits to Dr. Kelkar are similarly equivocal, admit a lack of evidence, or provide no detail as to how a diagnosis was determined. On May 1, 2018, Dr. Kelkar ordered an MRI and noted "*if there is suspicion* of [spinal fluid] leak" he would order a follow up CT scan. (ECF No. 20-11, PageID.290 (emphasis added).) On June 18, 2018, the doctor stated: "we are unable to locate the source of the leak." (*Id.*, PageID.287.) On July 24, 2018, Dr. Kelkar noted the same thing. (*Id.*, PageID.285.) Plaintiff underwent lumbar drain placement in early August 2018. After that, Dr. Kelkar continued to list spinal fluid leak under his "assessments" but did not provide any explanation as to how he came to that observation. (*Id.*, PageID.276-283.) Most visits after the drain placement, the doctor provided no notes on the condition at all. (*Id.*)

Kelkar states that Plaintiff's medical imaging had shown "no clear identifiable defect." (*Id.*) Similarly, when Plaintiff was seen by a surgeon on June 18, 2019, "[s]pinal fluid leak" was listed under "CC" (shorthand for diagnosis), yet in the description below, the surgeon asserted that "no obvious leak site" could be found. (ECF No. 20-21, PageID.569-70.)

Plaintiff presents no evidence that a medical professional reviewed the extensive testing done on Plaintiff and based on those tests diagnosed Plaintiff with spinal fluid leak. Where doctors list spinal fluid leak as a "diagnosis," they do not provide detail as to how they came to that conclusion, what tests they were reviewing, or what methodology they employed. They merely list the condition as a conclusory "spinal fluid leak."

No affidavit or testimony from Dr. Kelkar or other doctors who listed spinal fluid leak as a diagnosis are included in the record. There are no explanations as to what the physicians were thinking at the time nor why they noted "spinal fluid leak."

The state of the evidence in this area contrasts with the evidence of Plaintiff's alleged herniated discs. There, Dr. Kelkar stated that he "reviewed" Plaintiff's numerous MRIs and affirmatively found that they "demonstrated multilevel disc herniations." (ECF No. 20-11, PageID.276, 284, 296, 301, 306.) Although many other doctors came to the opposite conclusion, Dr. Kelkar did not simply state his view in a conclusory manner, relying only upon Plaintiff's self-described symptoms, as was done here with respect to the purported "spinal fluid."

"If a court concludes that the evidence supporting the expert's position is insufficient to allow a reasonable [finder of fact] to conclude that the position more likely

15

than not is true, then the court remains free to prohibit the case from proceeding to the [finder of fact]." *Glaser v. Thompson Medical Co., Inc.*, 32 F.3d 969, 972 (6th Cir. 1994). "Although judges should respect scientific opinion and recognize their own limited scientific knowledge, nevertheless courts have a duty to inspect the reasoning of qualified scientific experts to determine whether a case should go to a [finder of fact]." *Id.* (quoting *Turpin v. Merrell Dow Pharms., Inc.*, 959 F.2d 1349, 1350 (6th Cir. 1992)). "Of course, an expert opinion which is conclusory and fails to set forth the underlying rationale is not adequate." *Austin v. Children's Hosp. Med. Ctr.*, 92 F.3d 1185 (Table), at *2 (6th Cir. 1996).

Here, repeated experts, after doing extensive and often invasive testing for a spinal fluid leak, found no evidence of the condition. Evidence favoring an alleged spinal fluid leak is lacking, and amounts to a "mere possibility" of the condition. *Mitchell*, 964 F.2d at 582. The diagnoses of spinal fluid leak are conclusory, contradicted by substantial medical testing, and, ultimately, "insufficient to allow a reasonable [finder of fact] to conclude that the [condition] more likely than not [to exist]." *Austin*, 92 F.3d 1185 (Table), at *2; *Glaser*, 32 F.3d at 972.

Although the court finds summary judgment appropriate in favor of Defendant on the existence of a spinal fluid leak, the court will grant summary judgment also on the issue of causation. Not only is the injury itself speculative, but causation linking any such injury to the USPS accident is lacking.

Plaintiff's claims sound in negligence, though presented in varying ways. (ECF No. 1, PageID.5-13.) Plaintiff must prove not only negligent conduct and damages, but also connect the two through causation. *Haliw v. Sterling Heights*, 464 Mich. 297, 309-

16

10 (2001) (listing the elements of negligence). "Proof of causation requires both cause in fact and legal, or proximate, cause. Cause in fact requires that the harmful result would not have come about but for the defendant's negligent conduct. On the other hand, legal cause or 'proximate cause' normally involves examining the foreseeability of consequences, and whether a defendant should be held legally responsible for such consequences." *Id.* (quoting *Skinner v. Square D Co.*, 445 Mich. 153, 162-63 (1994)); *Ray v. Swager*, 501 Mich. 52, 63-64 (2017).

"Plaintiff must introduce evidence which provides a reasonable basis upon which a [finder of fact] could conclude that it was more likely than not that the defendant's conduct in fact caused the injury. 'A mere possibility of such causation is not enough; and when the matter remains one of pure speculation or conjecture, or the probabilities are at best evenly balanced,' the plaintiff has not met the burden." *Glaser*, 32 F.3d at 971 (quoting *Mulholland v. DEC Int'l Corp.*, 432 Mich. 395, 416 n.18 (1989)). Simply because an injury occurred after an event does not provide a sufficient basis to find causation. "[P]ost hoc, ergo propter hoc is not a rule of legal causation." *Abbott v. Fed. Forge, Inc.*, 912 F.2d 867, 875 (6th Cir. 1990); *Lowery v. Enbridge Energy Ltd. P'ship*, 500 Mich. 1034, 1034 (2017) (quoting *Genesee Merchs. Bank & Trust Co. v. Payne*, 381 Mich. 234, 248 (1968) ("But fact-finders, be they jury or court, may not indulge in conjecture. They are constrained to draw reasonable inferences from established facts. Reasoning 'post hoc ergo propter hoc' does not meet this test.").

Here, the record shows no evidence that a medical professional has ever stated or concluded that the accident at issue *caused* Plaintiff's nasal dripping, which itself only *might* have been spinal fluid. There is no record of explanations made to support such a

17

conclusion, and there are no descriptions of procedures and evaluations made to form the basis for such a conclusion. The record is simply devoid of any affirmative connection from Plaintiff's June 2017 collision with a mail truck and the onset of Plaintiff's claimed spinal leak symptoms.

Indeed, the only expert who has addressed the causation question has rejected it. The physician conducting the IME concluded that it is "[not] possible to say within a reasonable degree of medical certainty . . . that the motor vehicle accident in question caused [Plaintiff] to suffer a spinal fluid leak." (ECF No. 20-23, PageID.658.) Plaintiff has presented no evidence to refute this conclusion.

In fact, Plaintiff fails to present arguments on the issue of causation in her briefing. The court's own review of the record yields little support. The extent of any evidence in the direction of causation are statements in doctor's notes regarding the possible existence of spinal fluid leak, and then additional references that symptoms for the condition began "after" the accident at issue. For example, Plaintiff's visit to the ER on May 7, 2018 produced notes indicating that Plaintiff has sought treatment for "neck pain post [motor vehicle collision] in 6/2017"; Plaintiff was "doing a yoga pose with her head down and had a 'flood of fluid' from her right nare"; and then sought treatment for spinal fluid leaking. (ECF No. 20-17, PageID.500, 509, 514, 520.) When Plaintiff received a lumbar drain placement on August 3, 2018, medical notes stated that her treatment with Dr. Kelkar began "after she had a motor vehicle accident" and she began to experience nasal drip "during her treatment course." (ECF No. 20-18, PageID.543.) The notes also mention that her status was "post motor vehicle collision" and symptoms began "since a [motor vehicle accident]." (*Id.*, PageID.542-43.) When Plaintiff was seen

by surgeon on June 18, 2019, her patient history was described as having a motor vehicle accident in June 2017 and experiencing symptoms ten months later. (ECF No. 20-21, PageID.569; ECF No. 20-4, PageID.208; ECF No. 20-11, PageID.293.)

As noted above, simply because a condition appears *following* an event does not mean the condition was *caused* by the event. *Abbott*, 912 F.2d at 875; *Lowery*, 500 Mich. at 1034. Short references in medical notes to nasal dripping beginning "after" an accident reflects, at most, "[a] mere possibility" the accident caused spinal fluid leaking. *Glaser*, 32 F.3d at 971. A finding of causation on these facts would be "pure speculation." *Id.* While there may be hints the accident caused Plaintiff's condition, the IME has affirmatively rejected that contention. (ECF No. 20-23, PageID.658.) Plaintiff has not "come forward with specific facts showing that there is a genuine issue for trial," and as a matter of law, damages from Plaintiff's alleged spinal fluid leak are not recoverable. Fed. R. Civ. P. 56(a); *Matsushita Elec. Indus. Co.*, 475 U.S. at 587. The court will grant summary judgment in favor of Defendant on the issue of causation. Fed. R. Civ. P. 56(a).

## IV. CONCLUSION

Plaintiff cannot and does not seek to recover damages for lost income. As a matter of law, Plaintiff cannot recover damages for her alleged spinal fluid leak. But there is a question of fact as to whether Plaintiff suffered herniated discs. Fed. R. Civ. P. 56(a). Accordingly,

IT IS ORDERED that Defendant's "Motion for Partial Summary Judgment" (ECF No. 20) is GRANTED IN PART AND DENIED IN PART. IT IS GRANTED with respect to

Plaintiff's claim for damages for lost income and an alleged spinal fluid leak. IT IS

DENIED with respect to Plaintiff's claim for damages for herniated discs.

s/Robert H. Cleland             /<br>
ROBERT H. CLELAND<br>
UNITED STATES DISTRICT JUDGE

Dated:  May 20, 2020

I hereby certify that a copy of the foregoing document was mailed to counsel of record on this date, May 20, 2020, by electronic and/or ordinary mail.

s/Lisa Wagner                    /<br>
Case Manager and Deputy Clerk<br>
(810) 292-6522

S:\Cleland\Cleland\JUDGE'S DESK\C2 ORDERS\18-13429.NABOYCHIK.MotionforPartialSummaryJudgment.RMK.RHC.3.docx